The opinion of the Court was delivered by
Withers, J.
This is not precisely a case of master and apprentice. The defendant, Arnold, received two slaves of the plaintiff, White, on a contract of hire, at the very low rate of $36 a year for both, and the consideration moving from Arnold was, that he was thoroughly to instruct the negroes in the business of a Blacksmith, during the term of five years as to one and seven years as to the other : that during those terms they were to be completely subject to him : that he was to feed, clothe and shoe them, and to take such care of them as would be proper, under the circumstances: that in case of the sickness of either, he was to be sent, on such occasion and such only, to White, the owner and the plaintiff.
The negroes ran away and were' lodged in the workhouse as runaways. Arnold was informed of the fact as soon as it was known by the plaintiff, (or his son, in his behalf,) but he would *143 not take them out, on account of the expenses to be paid, though he was willing to receive them again, if White would pay the expenses, release and re-deliver them. The contest was, in reality, as to who should pay the expenses — White in fact paid the bill of the workhouse, returned the negroes — they were received by Arnold, and the question arises, Was Arnold bound in law, to refund such expenses to the plaintiff, White ?
The Recorder thought not, and so decreed, and we have the question on appeal.
If it turned upon the construction of evidence, we would, as usual, hold the decree below quite equivalent to a jury’s verdict. But it is'a point of law, and we must resolve it as best we may.
The case is not free from difficulty, let it be decided as it may. It probably would be, if it appeared, (though it does not,) that the negroes ran away through the default or misfeasance of Arnold, or, on the contrary, of White. We must assume they eloped by reason of their contumacious perversity.
By the course of our decisions, he who hires a slave for a term, is regarded as the owner for such term. This is true very generally, if not universally as to third persons. In a great degree true likewise as to the master or real owner. The hirer must pay such current expenses as the master would be liable to pay; he must pay the stipulated compensation, or the quantum valebat, though the slave run away, or be disabled by sickness, originating during the term. The expense of relief to the slave, found in necessitous circumstances, would raise an assumpsit by the hirer, to re-imburse a third person, moved by humanity, and the emergency of the case, to minister relief, as medical assistance for example. It is not perceived how we can apply any other rule, or principle of law to the present case. Here was an incidental expense, not incurred by the default of the plaintiff any more than that of the defendant. The slaves were in the service of Arnold, at the time, who, as well by express contract, as by implication of law, was liable to the burthen of expenses, incident to the bailment, of whatever character, save *144 only that specially excepted in the agreement between these parties. When they were arrested and secured, for whose benefit —to whom, did that service enure, immediately and directly 1 In general we must allow that such service would be rendered to the master. And in the ordinary case of the arrest of runaways, the master is liable. But the question recurs, who was the master, pro hac vice, in the present instance 1 The answer is, Arnold. It does not seem material, that indirectly, mediately, remotely, the absolute owner would also find an interest in the restoration of the negroes to their proper service, and, therefore, to the means and opportunity of instruction. He, the real owner, would have the same kind of, collateral, indirect benefit, if a doctor had administered physic in a case of casual necessity, or one had saved life or health by food and clothing, in like circumstances. It appears to us, however, that in these latter supposed cases, the assumpsit would be by the temporary owner, the hirer.
If some of the foregoing observations be well founded, it would follow, that Arnold could lawfully reclaim and ought to have reclaimed the negroes from the authorities of the workhouse. Upon exhibiting and authenticating his dominion oyer them, a refusal to re-deliver would be an invasion of his rights, capable of redress at law. It does not matter that, perhaps, the absolute owner might also be liable to the workhouse for fees, and competent to claim the delivery of the negroes to him. It is not unfamiliar, that cause of action, or of indictment, may arise, in favor of both owner and hirer, out of the same transaction : or a civil action maintainable by the one, and a prosecution by the other.
It is urged that the payment by White was voluntary : and that to maintain his right to reimbursement would authorise his improper interference with a clear right, on the part of Arnold, to leave the negroes in the workhouse, at pleasure, for the purpose of discipline.
It occurs to us to answer, that, by the agreement, the leading interest of White,, the main consideration of his contract, was the *145 thorough instruction of his negroes in the .mystery of Arnold’s trade. Nothing could accomplish that end except the release and restoration of the negroes. We have suggested considerations to shew, that legally it was Arnold’s duty to do this. To rescind the contract, (if it he allowed that White was warranted so to do,) and resort to an action for damages, would he quite unsuited to such a purpose. And as to the matter of discipline, it is proper to say, that it no where appears Arnold was moved by any such purpose : the contest was wholly concerning the liability to pay the workhouse fees.
Touching the right of recision in this and such like cases, it is a fit occasion to observe, that when we encounter such a question, we may feel obliged to advert to the anomalous character of such relations as spring out of the letting to hire, or to a species of apprenticeship, of negro slaves — the duty of the master, or absolute owner, in whom centres the rights of the slave, such as they are, to vindicate the obligation of humanity and a great interest, although for a term and to a certain extent, he has transferred dominion to another — and we may be led to feel more strongly the force of all such considerations, if it should turn out that/in such cases, the Court of Equity may not see a proper field to apply its jurisdiction in the specific enforcement of contracts.
Extreme cases are suggested, on either hand; as, for example, the escape of a slave to a distant State, New-York, or elsewhere, where the expense of reclamation might be enormous, more or less so. Or the case of leaving a slave in jail, under pretence of discipline, but with an object very different, very unfaithful, and very unlawful, thus subjecting the slave to peril of life or otherwise, and the owner to great detriment. These suggestions do serve to shew the inherent difficulty of the case, and the still greater difficulty and danger of delivering, on the occasion, a dogmatical, rigid rule of universal application. But if the judgment of a Court, or the conduct of an individual, were made to wait on the removal of all possible difficulties, inconveniences, and dangers, that might lie in the way, there would *146 be a degree of inertness and torpidity quite subversive of the duties of life.
Not denying the force of what has been said by the Judge below and at the Bar, on behalf of the defendant’s case, we are nevertheless of the opinion that, upon the case made, the better judgment is, the plaintiff is entitled to recover, and a new trial is, therefore, ordered.
O’Neall, Whitner and Glover, J J., concurred.
Wakdlaw, J., absent at the hearing.

Motion granted.